479 So.2d 140 (1985)
GEORGIA-PACIFIC CORPORATION, Appellant/Cross-Appellee,
v.
Edmond CHARLES, Etc., et al., Appellees/Cross-Appellants.
No. 84-1360.
District Court of Appeal of Florida, Fifth District.
October 31, 1985.
Rehearing Denied December 6, 1985.
J. Randall Hooper and Parks M. Carmichael of Scruggs & Carmichael, P.A., Gainesville, for appellant/cross-appellee.
John F. Welch, Ocala, for appellees/cross-appellants Edmond Charles and Renee C. Goldman.
*141 James D. Druck of Druck & Hicks, P.A., Ocala, for appellees Harry E. Weber, W.C.C., Inc., American Universal Ins. Co., and Canadian Universal Ins. Co., Inc.
BOARDMAN, E.F., Associate Judge.
This case arises out of an automobile accident in which Edmond Charles was severely injured and his wife Eva Charles was killed. Mr. Charles and the personal representative of his wife's estate subsequently brought suit against the driver of the other vehicle (Harry Weber), and against W.C.C., Inc. (Weber's corporation), Weber's liability insurers, Georgia-Pacific Corporation, and Georgia-Pacific's liability insurers. Prior to trial, Weber admitted negligence and the parties stipulated to the following facts to expedite and simplify the trial proceedings: (1) Plaintiffs Edmond Charles and Eva Charles and defendant Harry Weber were involved in a highway accident on February 8, 1982, at approximately 8 p.m. (2) Weber was driving a truck owned by W.C.C., Inc. and hauling logs owned by Georgia-Pacific. (3) Weber was negligent in operating his truck and his negligence was a legal cause of damages to the plaintiffs. (4) Weber and Georgia-Pacific had entered into a "hauling contract" on January 1, 1982, which was in effect on the date of the accident. The parties also stipulated that the only issues to be tried before the jury were: (1) Whether Weber was an employee of Georgia-Pacific acting in the course and scope of that employment or was an independent contractor. (2) Whether Georgia-Pacific had negligently permitted Weber to operate the truck under unsafe conditions and if so, whether Georgia-Pacific's negligence was a legal cause of damages to the plaintiffs. (3) Whether Edmond Charles was negligent in operating his automobile, and if so, whether his negligence was a legal cause of damages to the plaintiffs. (4) The amount of plaintiffs' damages resulting from the accident. Subsequently, both Weber and Georgia-Pacific filed cross-claims for contribution and indemnity against each other.
The evidence before the jury showed that by contract, Weber's role was to assist "logging contractors" in hauling logs to the Georgia-Pacific mills. The logging contractors' role was to cut, load and haul Georgia-Pacific's logs to Georgia-Pacific's mills. A hauling contractor, such as Weber, was needed when a particular tract of timber was located at a great distance from the Georgia-Pacific mills.
The evidence also established that at the time of the accident, Weber's truck had no side lights or reflectors, was overloaded and was carrying oversized logs. The accident occurred as follows: Weber was driving his truck at night in a southerly direction on Ridgeview Avenue in Ocala to its intersection with State Road 40, which is at the bottom of a hill. The plaintiffs' vehicle was heading west on State Road 40. Weber turned left on State Road 40 at which time the plaintiffs' vehicle collided with the trailer portion of the Weber vehicle in the area just in front of the rear tandem wheels. Edmond Charles testified that as he came over the hill prior to the intersection, the first thing he saw was logs and he never saw any lights at all.
At the close of the plaintiffs' case, as well as at the close of all the evidence, Georgia-Pacific moved for a directed verdict on the ground that plaintiffs had not established that Weber was Georgia-Pacific's employee as a matter of law and that plaintiffs had not established that Georgia-Pacific had negligently contributed to the accident as a matter of law. Both motions were denied. After deliberating, the jury returned a special verdict finding, inter alia, that Weber was an employee of Georgia-Pacific and was acting in the scope of his employment at the time and place of the accident and that there was negligence by Georgia-Pacific which was a legal cause of damage to plaintiffs. The verdict awarded damages to the plaintiffs and apportioned the damages between Weber and Georgia-Pacific, less the value of the plaintiffs' contributory negligence. The trial court then entered judgments in accordance with the jury's verdict, denied both claims for indemnity, and found both Weber *142 and Georgia-Pacific entitled to contribution in the exact amount set out by the jury's verdict. Georgia-Pacific appeals from those judgments claiming that the trial court erred in denying its motions for directed verdict. We agree and reverse.
It is by now well-established that an employer is vicariously liable for the torts of his employee (acting within the scope of his employment) under the doctrine of respondeat superior, but that an employer is not liable for torts caused by one considered the employer's independent contractor. See, e.g., Lee v. American Family Life Assurance Company, 431 So.2d 249, 250 (Fla. 1st DCA 1983); Roark v. Peters, 242 So.2d 199, 200 (Fla. 1st DCA 1970). Florida courts have consistently applied the test developed in Restatement and Restatement (Second) of the Law of Agency in order to determine whether an individual is an employee (the Restatement uses the term "servant") as opposed to an independent contractor. See, e.g., Magarian v. Southern Fruit Distributors, 146 Fla. 773, 1 So.2d 858 (1941); Hilldrup Transfer & Storage v. State Dept. of Labor, etc., 447 So.2d 414 (Fla. 5th DCA 1984). Restatement (Second) of Agency, § 220 (1958), provides:
Definition of Servant
(1) A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control.
(2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:
(a) the extent of control which, by the agreement, the master may exercise over the details of the work;
(b) whether or not the one employed is engaged in a distinct occupation or business;
(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
(d) the skill required in the particular occupation;
(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
(f) the length of time for which the person is employed;
(g) the method of payment, whether by the time or by the job;
(h) whether or not the work is a part of the regular business of the employer;
(i) whether or not the parties believe they are creating the relation of master and servant; and
(j) whether the principal is or is not in business.
Comment (c) to this section provides in part:

Generality of definition. The relation of master and servant is one not capable of exact definition. .. . The factors stated in Subsection (2) are all considered in determining the question, and it is for the triers of fact to determine whether or not there is a sufficient group of favorable factors to establish the relation... . If the inference is clear that there is, or is not, a master and servant relation, it is made by the court; otherwise the jury determines the question after instruction by the court as to the matters of fact to be considered. (emphasis supplied)[1]
In this case, after reviewing all the factors, we hold that the inference is clear that there is no master and servant relation here.
(a) Extent of control over the details of the work. Weber testified at trial, without contradiction, that he was free to accept or reject any hauling work offered to him by Georgia-Pacific; that the route he took was always left up to him (although he was paid for the most direct route); that he didn't have any kind of radio connection with Georgia-Pacific to keep them advised *143 of where he was; that his starting time and quitting time for work each day was left up to him; and that he had the right to hire workers to drive his truck for him. Moreover, one of Georgia-Pacific's own representatives testified that Weber was free to haul for other companies. These facts are pivotal. In Hilldrup Transfer v. State, Department of Labor, supra, a majority of this court held that "By permitting the operators to set their own work hours and routes, hire and supervise their own helpers and accept or reject work assignments, Hilldrup has indicated a lack of interest in the details of their work." 447 So.2d at 417.
Plaintiffs point to the fact that Weber was required to have a Georgia-Pacific decal on his truck in order to haul its logs. However, representatives of Georgia-Pacific testified that the decals are merely a security measure to identify the vehicle on the road as belonging to a Georgia-Pacific contractor and to distinguish such vehicles from other trucks which deliver logs to Georgia-Pacific mills. This court in Hilldrup Transfer, supra, indicated that "the requirement that the operators wear uniforms and paint their tractors with Hilldrup's colors and name [was] merely designed to assure the carrier's customers that the operators [were] representatives of Hilldrup" and therefore these facts were not true elements of control over the details of work. 447 So.2d at 417. It is true that Georgia-Pacific had certain specifications with regard to the manner in which logs are loaded and unloaded and had the right to search all trucks as they came into their mill. However, we believe that the loading and unloading specifications were merely safety measures designed to prevent injury to loggers and haulers and did not demonstrate a right to control the details of the work. Similarly, the right to search was merely a security measure, again not a right to control the details of the work. In any event, all trucks which entered Georgia-Pacific mills, not merely trucks belonging to Georgia-Pacific contractors, were subject to these regulations.
(b) Distinct occupation or business. It is clear that Weber was engaged in the trucking business while Georgia-Pacific was engaged in the business of manufacturing wood and paper products.
(c) Whether, in the local industry, the work is usually done under the direction of the employer or by a specialist without supervision. The testimony below indicated that log hauling was customarily performed by independent contractors (logging contractors) and that hauling contractors were used to supplement logging contractors when the trips required great distances.
(d) Skill required. Plaintiffs rely heavily on Justice v. Belford Trucking Company, Inc., 272 So.2d 131 (Fla. 1973), in which the Florida Supreme Court stated that "There was no evidence showing that claimant had any particular skill or specialty other than that of an ordinary truck driver employed by a carrier in the trucking business." 272 So.2d at 136. However, the employer in Justice was a trucking company and therefore its employees only needed to have truckers' skills. In this case, the testimony indicated that log hauling is customarily performed by logging contractors who must possess the requisite skill to load, operate and unload large log trucks.
(e) Who supplied the instrumentalities, tools, etc. It is undisputed that Weber supplied his own truck, trailer and equipment for hauling the logs, was responsible for making all repairs to the equipment and paid for his own fuel and maintenance.
(f) Length of employment. Weber signed a one year hauling contract about three months prior to the accident but it is undisputed that either party could have terminated the contract at an earlier time without liability. Although Florida courts have generally indicated that the ability to terminate the relationship at will without incurring liability is an indication that the person employed is not an independent contractor, see Cantor v. Cochran, 184 So.2d 173 (Fla. 1966); Hammel v. Pittman, 389 So.2d 1220 (Fla. 1st DCA 1980), Georgia-Pacific *144 points out that if either Georgia-Pacific or Weber terminated the relationship, Weber would be obligated to finish his run and Georgia-Pacific would be liable at the contract rate on all logs he hauled. In Lee v. American Family Life Assurance Company, 431 So.2d 249 (Fla. 1st DCA 1983), the court found that the fact that the individual in question would continue to be liable to the alleged employer (an insurance company) for renewal commissions which had already vested for the policies the individual had generated was an indication that the individual was an independent contractor and not an employee.
(g) Method of payment. The evidence clearly established that Weber was paid by the load and not by the hour.
(h) Whether or not the work is part of the regular business of the employer. As pointed out by Georgia-Pacific, although it was necessary for it to somehow move its timber from the woods to the mill, trucking itself was not a part of its regular business.
(i) Belief of the parties. The written contract in this case clearly stated that "the Contractor [Weber] is an independent contractor in the performance of each and every part of this Contract ... [and] Georgia-Pacific has no control over the time, method or manner in which Contractor performs under this Contract, but Georgia-Pacific has the right only to require definite results by Contractor in conformity with the provisions of this Contract." Although this provision is not controlling, see Justice v. Belford Trucking Company, Inc., supra, it does indicate "a refusal by the worker to submit to pervasive control by the company and a recognition by the company of the absence of a master's control over the worker." LaGrande v. B & L Services, Inc., 432 So.2d 1364, 1367 (Fla. 1st DCA 1983). Moreover, this court in Hilldrup Transfer, supra, found a similar provision to be important where it was not a subterfuge to avoid the payment of unemployment or other taxes.
We note that nearly all of the Florida cases which have considered the issue of whether a trucker was an employee or an independent contract have concluded that the trucker was an independent contractor. See, e.g., Peterson v. Highland Crate Co-Op., 156 Fla. 539, 23 So.2d 716 (1945); Hilldrup Transfer and Storage v. State, Department of Labor, etc., 447 So.2d 414 (Fla. 5th DCA 1984); A Nu Transfer, Inc. v. Dept. of Labor and Employment Security, 427 So.2d 305 (Fla. 3d DCA 1983); Roark v. Peters, 242 So.2d 199 (Fla. 1st DCA 1970).[2] The only Florida cases to the contrary are Justice v. Belford Trucking Company, Inc., 272 So.2d 131 (Fla. 1972), and Taylor v. Williams, 40 So.2d 122 (Fla. 1949); however those cases can be distinguished on the facts. In Taylor, the trucker was employed by a sawmill owner on a daily basis to cut logs as well as load them on trucks; the sawmill owner owned the skidder and some of the tools used by the logger and his crew and supplied the logger with money to meet his weekly payroll. Here, it is undisputed that Weber supplied all the instrumentalities and tools that he used and Weber received no money other than a percentage of the load that he hauled. In Justice, the trucker drove for a trucking company, was subject to call or dispatch by the company, was threatened by termination if he did not accept assignments, and had deductions taken from his compensation for income tax and social security. In this case, Weber and Georgia-Pacific are in two separate trades (Weber as a hauler or trucker, Georgia-Pacific as a manufacturer of wood). Weber is not subject to call or dispatch, is free to accept or reject assignments, is paid by the load and pays his own taxes.
Because we conclude that the jury's finding that Weber was an employee rather than an independent contractor was *145 not supported by the evidence, Georgia-Pacific could only be liable in this case if it were independently negligent. However, we hold that the jury's finding that Georgia-Pacific was independently negligent was also unsupported by the evidence. The only plausible argument which could be made for holding Georgia-Pacific liable for actual negligence was that Georgia-Pacific permitted Weber to operate his truck under unsafe conditions. We reject this argument. First, the fact that the truck was overloaded and carrying oversized logs was irrelevant because the size and weight of the truck were not contributing factors to the cause of the accident. Second, although the lack of side reflectors was admittedly the proximate cause of the accident, because we have found that Weber was an independent contractor and not an employee of Georgia-Pacific we believe that Georgia-Pacific had no duty to prevent Weber from riding without reflector lights.
Because neither of plaintiffs' theories holding Georgia-Pacific liable was supported by substantial competent evidence, this case is reversed as to the issue of Georgia-Pacific's liability, and remanded with instructions to enter judgment for Georgia-Pacific. Also, because it is unclear to us what amount of damages the jury would have assessed against Weber had Georgia-Pacific not been a party in this case, we reverse the damage award against Weber and remand for a new trial on the issue of damages only.[3] These rulings render the plaintiffs' cross-appeal moot.[4]
REVERSED and REMANDED.
DAUKSCH, J., concurs.
SHARP, J., dissents with opinion.
SHARP, Judge, dissenting.
I dissent, basicially for the reasons stated in my dissent in Hilldrup Transfer and Storage v. State Department of Labor, etc., 447 So.2d 414 (Fla. 5th DCA 1984). Here, as there, I think there was sufficient evidence of control and integration of functions performed by Weber for Georgia-Pacific to permit a finder of fact to find that Weber was an employee as defined by the Restatement (Second) of Agency.[1]
Several signs were located on Georgia-Pacific's property which required the truckers to load and unload logs in a particular manner; trucks were subject to search; trucks were required to bear a Georgia-Pacific decal; Georgia-Pacific provided a liability and workers compensation insurance program, and deducted the insurance premiums from the truckers' compensation checks; and under the workers compensation statute, truckers such as Weber are considered "employees." Georgia-Pacific contends that many of these measures were "safety" measures. However, it is not the nature of the measures but rather the actual control extended by those measures to Georgia-Pacific over the truckers that is at issue here. Because Georgia-Pacific was self-insured as to a substantial portion of its truckers, it could indirectly enforce various safety measures and inspections upon the truckers by cancelling the insurance contracts of those truckers who failed to comply.
With proper contract wording, companies can relieve themselves of tort liability to *146 the general public and any obligation to maintain safety measures for transportation of its essential supplies by hiring "independent" truckers, while at the same time controlling those factors which are in their best interests to control. This trend, if left unchecked, could result in independent contractor status for many drivers, chauffeurs, captains and pilots who are currently classified as employees. The resulting legal effect would be insulation of liability for those enterprises they serve and deprivation of liability compensation to the general public from inadequately insured "independents."
Ultimately, one begins to question the rationale and justification for different treatment of tort liability in cases involving employees and independent contractors where, as here and in Hilldrup, the functions performed by the truckers for the enterprises are essentially the same. The common law general rule that an employer is not liable for the act or omission of its independent contractor is general "only in the sense that it is applied where no good reason is found for departing from it."[2] Even accepting Georgia-Pacific's argument that many measures taken by Georgia-Pacific were mere "safety measures"[3] not supervisory ones, I think appellant's theory of negligence would sustain the jury verdict in this case. Safety measures improperly performed generate liability where none previously existed.[4]
For these reasons, I would affirm.
NOTES
[1] Comment (c) was cited with approval in Magarian v. Southern Fruit Distributors, supra.
[2] See also United States v. Silk, 331 U.S. 704, 719, 67 S.Ct. 1463, 1471, 91 L.Ed. 1757 (1947), where the United States Supreme Court indicated that the fact that the truckers in that case owned their own trucks and assumed the risk for profit or loss required a finding that the truckers were independent contractors.
[3] The parties have informed this court that since the judgment was entered in this case, the plaintiffs and Weber have entered into an agreement in which Weber paid his share of the liability in exchange for which the plaintiffs released Weber from any claims arising out of this dispute. We decline to comment on the effect of this agreement on the issue of damages because the agreement was not in the record. Any claims relating to this agreement must be presented to the trial court.
[4] We note in passing, however, that the plaintiffs' reliance in their cross-appeal on the recent case of Protective Casualty Ins. Co. v. Killane, 459 So.2d 1037 (Fla. 1984), is well-taken. That case specifically holds that the "seat belt defense" must be raised in the pre-trial pleadings in order to be validly considered as an issue at trial. The seat belt defense was not raised by the defendants in the instant case until after the plaintiffs had submitted all their evidence in their case in chief.
[1] Restatement of Agency (Second) § 220(2) (1958).
[2] Restatement Torts (Second) § 409 (1965), Comment b.
[3] For example, the loading of the logs in a required manner.
[4] Restatement Torts (Second) § 305 (1965), Preventing Protective Action.