486 So.2d 637 (1986)
Florence Mildred NAZWORTH, Individually, and As Personal Representative of the Estate of Henry Roy Nazworth, Deceased, and As Surviving Spouse, Appellant,
v.
SWIRE FLORIDA, INC., a Corporation, United States Fire Insurance Company, a Corporation, and the North River Insurance Company, a Corporation, Appellees.
No. BI-73.
District Court of Appeal of Florida, First District.
April 4, 1986.
Rutledge R. Liles, and J. Bruce Bickner, of Howell, Liles, Braddock & Milton, Jacksonville, for appellant.
Robert L. Cowles and James R. Barfield of Cowles, Hayden, Facciolo, McMorrow & Barfield, P.A., Jacksonville, and Daniel C. Shaughnessy and Howard C. Coker of Coker, Myers & Schickel, Jacksonville, for appellees.
NIMMONS, Judge.
This appeal arises from consolidated personal injury and wrongful death actions in which a final summary judgment was granted in favor of Swire Florida, Inc. ("Swire") and three insurers, finding that Swire was not responsible for the alleged negligence of an employee of Consultants Realty ("Consultants"), the court ruling that Consultants was an independent contractor as a matter of law. We reverse.
Appellant's husband was killed in an automobile collision between him and Goff, an off-duty police officer employed as a security guard at the Gateway Shopping Center by Consultants which managed the shopping center for Swire, the owner. Goff had received a call that a shoplifter had fled the Montgomery Ward store. He began searching for the suspect in his personal vehicle when he struck the decedent's vehicle about a mile from the shopping center, killing the decedent and seriously injuring his wife, the appellant. She subsequently filed these consolidated actions.
The appellant challenges on appeal the trial court's ruling that Consultants' relationship to Swire was, as a matter of law, that of an independent contractor.
A summary judgment is only appropriate where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. If the evidence is susceptible of several inferences, one of which will support the non-moving party's *638 theory of the case, the issue should be determined by the trier of fact. Burkett v. Parker, 410 So.2d 947 (Fla. 1st DCA 1982).
The record shows that Swire purchased Gateway Shopping Center in the 1970's. At the time of the purchase, Gateway was being managed by Consultants. The written management contract was entered into in 1973 between Consultants and a prior owner of Gateway. The agreement was continued in force after Swire's purchase of Gateway. The operative provisions of the agreement are reproduced in the appendix to this opinion. David Young, an employee of Consultants, was the individual who performed the day-to-day management of Gateway and who carried out Consultants' obligations under the management agreement. In his deposition, Young described Consultants as a realty and management company. It is unclear from the record as to whether Consultants managed any other properties than Gateway.
Young had standing authority from Consultants "to hire X number of security guards" at Gateway. It was Young who hired and supervised Officer Goff.
The general rule, with certain exceptions, is that an owner, employer, or contractee will not be held liable for the torts of an independent contractor or of the latter's employees committed in the performance of the contracted work. 41 Am Jur 2nd Independent Contractors, Section 24; see Webb v. Priest, 413 So.2d 43, fn. 2 at 47 (Fla. 3d DCA 1982); Brien v. 18925 Collins Avenue Corp., 233 So.2d 847 (Fla. 3d DCA 1970); 2 Fla.Jur 2nd Agency and Employment, Section 109.
In the instant appeal, the parties agree that the determinative issue is whether, as to Swire, Consultants was an independent contractor.
In arguing against independent contractor status, Appellant relies, in part, upon the fact that the management agreement refers to Consultants as "Agent." But such reference is of no moment. As pointed out in RESTATEMENT (SECOND) AGENCY 2nd Section 14N:
Section 14 N. Agent and Independent Contractor.
One who contracts to act on behalf of another and subject to the other's control except with respect to his physical conduct is an agent and also an independent contractor.
Comment:
a. Independent contractor as agent. As stated in Section 2, "independent contractor" is a term which is antithetical to the word "servant", although not to the word "agent". In fact, most of the persons known as agents, that is, brokers, factors, attorneys, collection agencies, and selling agencies are independent contractors as the term is used in the Restatement of this Subject, since they are contractors but, although employed to perform services, are not subject to the control or right to control of the principal with respect to their physical conduct in the performance of the services. However, they fall within the category of agent.
See also Id., Section 250. In any event, the agreement's use of a certain descriptive label for one of the contracting parties is not determinative of the actual legal relationship between the parties. See Cantor v. Cochran, 184 So.2d 173, 174 (Fla. 1966); LaGrande v. B & L Services, Inc., 432 So.2d 1364 (Fla. 1st DCA 1983).
The standard for determining whether an agent is an independent contractor is the degree of control exercised by the employer or owner over the agent. DeBolt v. Department of Health and Rehabilitative Services, 427 So.2d 221 (Fla. 1st DCA 1983); Restatement, supra, Section 250. More particularly, it is the right of control, and not actual control, which determines the relationship between the parties. Adams v. Department of Labor and Employment Security, 458 So.2d 1161 (Fla. 1st DCA 1984); LaGrande v. B & L Services, Inc., supra.
The management agreement contains specific limitations on various duties and *639 functions of Consultants including the following: Swire had the right to indicate to Consultants its preferred sources of supplies and could require bids; Consultants could pay bills incurred by Swire or Consultants only at the direction of Swire; Consultants could not incur more than $150 expense for collections without the approval of Swire; Consultants could not spend more than $1500 for an individual repair or maintenance problem without approval from Swire; Swire required Consultants to insure the premises in such amount and for such risks as Swire determined.
Although the agreement does not specifically address the subject of security at Gateway, Consultants employed security guards with the knowledge and approval of Swire. In fact, although such guards were paid with Consultants' checks, Consultants regularly was reimbursed therefor by Swire. From this record, the trier of fact could conclude that Swire would be entitled to oversee and monitor the provision for security at Gateway, including the employment of security guards by Consultants.
We also note that, within two months after the accident, Swire terminated the management agreement with Consultants and proceeded to manage Gateway "in house" with its own employees. Young terminated his employment with Consultants and commenced working for Swire, managing the shopping center on site in much the same manner as he had previously.
The record, as developed at this time, is such that the trier of fact could fairly conclude that Swire maintained a degree of control over Consultants in the management of Gateway such that Consultants was not an independent contractor of Swire.
In DeBolt v. Department of Health & Rehabilitative Services, supra, this Court stated:
The terms of the contract appeared to have imposed a number of conditions and limitations upon the [worker] which, at the very least, create a factual dispute as to their status, thus precluding summary judgment.
427 So.2d at 226-227. In DeBolt, the right of control could be inferred in part from contract provisions which required the operators of an "attention home" for juvenile delinquents to report any illnesses of the children in their care, to refrain from entering into agreements to care for other children without contacting the putative employer, and to refrain from incurring any expenses for the children other than those set out in the agreement without first contacting the employer. Despite the reference in the agreement to the "attention home parents" as independent contractors, this court held that summary judgment on the issue of the legal status of such parties was precluded. See also Adams v. Department of Labor & Employment Security, supra.
We find the authorities relied upon by Swire to be distinguishable. For example, in Ortega v. General Motors Corporation, 392 So.2d 40 (Fla. 4th DCA 1981), our sister court ruled that, despite a number of controls over an automobile dealership, the dealership was, as a matter of law, an independent contractor. The court there emphasized that the dealership owned its premises and inventory, and was ultimately responsible for the success or failure of the enterprise. In the present case, Consultants, through Young, was working on the premises of Swire. It was Swire who stood to lose if the shopping center failed. Also, in Miami Herald Publishing Company v. Kendall, 88 So.2d 276 (Fla. 1956), a newspaper carrier was held to be an independent contractor as a matter of law despite evidence that the supervisor "rode herd" over the carriers. In that case, the agreement between the carrier and the Miami Herald specifically reserved to the carrier the right to control the means of delivery. The company only had a right to expect the papers to be delivered timely and neatly.
In the present case, based upon the record before us, we cannot say as a matter of law that an independent contractor relationship existed. Accordingly, the summary *640 judgment is REVERSED and this case is REMANDED for further proceedings consistent with this opinion.
SHIVERS and JOANOS, JJ., concur.

APPENDIX
 The operative portions of the Management Agreement are
reproduced as follows:
 RECITALS
1. Owner owns Gateway Shopping Center, hereinafter called
 "Premises" located in Jacksonville, Florida.
2. Owner desires Agent to undertake the management of Premises
 and to act as his representative for Premises in the normal
 operational functions and affairs thereof.
IN CONSIDERATION of the mutual covenants and agreements contained
 herein and for other good and valuable considerations, the
 parties hereto agree as follows:
1. Owner hereby employs Agent to act as Owner's agent to manage
 and direct the operation of the Premises for a term commencing
 on September 1, 1973, and terminating on December 31, 1974,
 subject to the renewal provisions set forth below.
2. Agent accepts such employment and agrees to carry out and
 perform the terms and conditions of this Agreement on its part
 to be kept and performed.
3. Agent agrees to use its best efforts to perform the following
 services:
 (a) To rent all vacant space in the Premises;
 negotiate lease renewals and replace delinquent
 tenants as needed, all in accordance with leasing
 terms and conditions approved by the Owner.
 (b) Collect rent, invoice and collect all other
 payments due from tenants such as parking lot
 maintenance charges, tax increases, etc.
 (c) Maintain an adequate account of all transactions
 made on behalf of the Premises.
 (d) Coordinate the Merchants Association and
 represent Owner at all Merchants Association
 functions.
 (e) Let all contracts for maintenance, repairs and
 alterations and supervise same for Owner, providing,
 however, that except in emergencies all individual
 expenditures in excess of $1,500 shall require the
 prior approval of the Owner. General approval of
 annual expenses shall be required annually by
 approval of operating budget to be prepared by Agent
 and submitted to Owner.
 (f) The Owner shall indicate to Agent its preferred
 sources for all supplies for operating and servicing
 the Premises, and to require quotations or bids where
 Owner may consider these appropriate.
 (g) Undertake the collection of all delinquent rents.
 (h) Maintain complete liaison with each of the
 tenants.
 (i) Submit monthly reports in form prescribed by
 Owner reflecting the physical and financial condition
 of the Premises to Owner, not later than the
 twentieth day of the next succeeding month.
 (j) To deposit all rents collected in an agency bank
 account approved by Owner in the name of Owner and
 pay from the funds thus deposited, all bills incurred
 by Owner or Owner's Agent on account of management
 and maintenance, repairs and alterations of said
 Premises and any other items when so directed by
 Owner; and to remit on such monthly or other basis as
 directed by Owner any excess cash, according to the
 directions of Owner.
 (k) To exercise all Owner's contacts with the tenants
 including the dealing with any complaints.
 (l) Keep insurance placed on premises in such
 amounts and insuring against such risks with such
 insurance companies or agents as may be directed by
 the Owner.
*641 4. Owner shall pay Agent the sum of $3,333.33 per month, which
 Agent may monthly pay from the collected rents, such payment to
 be made in advance.
5. Agent shall be reimbursed such funds, previously approved in
 annual budget, as it may expend from its own payroll for the
 salary of a maintenance man or men employed on a weekly basis
 to maintain the Premises, which reimbursement shall include in
 addition to the weekly salary 15% thereof to cover employer's
 share of F.I.C.A., Workmen's Compensation and other insurance,
 State unemployment insurance and such other charges
 attributable to the employee's salary.
6. Agent shall be paid real estate commissions by Owner as
 follows:
 (a) With respect to all leases for ten years or less
 negotiated with new tenants a commission of 5% of
 gross minimum rent for all stores less than 2,000
 square feet and 2 1/2% of gross minimum rent for all
 stores of 2,000 square feet and over. If the lease is
 for five years or less, one-half of said commission
 shall be paid when said leases have been signed by
 the Owner and tenant and the remainder of the
 commission shall be paid when the term of the lease
 actually commences. If the lease is for over five
 years and not over ten years the commission with
 respect to the first five years shall be payable in
 the same fashion as a lease for five years or less.
 The commission with respect to rents for the period
 after five years shall be payable in two equal
 installments, the first installment being due on the
 first anniversary of the lease and the second
 installment being due on the second anniversary of
 the lease.
 (b) With respect to all leases for a period of over
 10 years the amount of commission and method of
 payment shall be as agreed upon by Owner and Agent.
 (c) With respect to any new lease or amendment to a
 lease with a then existing tenant, the commissions
 shall be the same percentages as set out in
 sub-paragraphs (a) and (b), above, but shall be
 figured only on the increase in rent, if any, over
 the prior lease. In arriving at the amount of such
 increase, the gross minimum rent under the new lease
 shall be compared with the total of all forms of rent
 and other compensation paid by the Tenant to the
 Owner under the prior lease during the immediately
 last preceding lease year under the prior lease.
 (d) No commission shall be payable with respect to
 the exercise by any tenant of a renewal option.
 In the event that a tenant vacates the premises prior
 to the expiration of its lease, Agent will reimburse
 Owner for a prorata credit for the unearned portion
 of the commission, provided that the Agent re-leases
 the vacated premises. It shall be the duty of the
 Agent to renegotiate leases, where possible, with the
 existing tenants in the Premises. Agent shall have an
 exclusive listing for all rentals in the Premises and
 shall be entitled to a commission in those instances
 where space is rented by another real estate broker;
 it being the responsibility of the Agent to pay such
 other broker any commissions due him.
7. The supervision referred to in paragraph 3(e) does not extend
 to architectural, engineering or general contractor
 supervision, payment for which services shall be borne by
 Owner, and is not included in the compensation paid to Agent
 for its services hereunder. Similarly, any cost of collection,
 such as retaining of attorneys or incurring charges for
 independent collection services shall also be borne by Owner
 and is not included in the compensation referred to herein. No
 such costs in excess of $150.00 shall be incurred without the
 consent of Owner.
8. Owner agrees to reimburse Agent for any disbursements that it
 may make from its own funds on behalf of Owner, which
 disbursements are to be considered
*642 as advances and which will be promptly reimbursed by Owner upon
 submission of detailed description of items so advanced.
9. In the event of the dissolution, cessation of business (for
 any cause whatsoever), bankruptcy, insolvency, or assignments
 for the benefit of creditors of or by Agent, or in the event of
 the improper handling by agent of their accounts, or in the
 event of any breach by Agent of its obligations under this
 Agreement, then and in any such events, Owner may immediately
 terminate this Agreement, at its option, upon giving written
 notice of such cancellation to Agent. In the event of the sale
 of the Premises or of any other premises being managed by Agent
 for Owner, either Owner or Agent may terminate this agreement
 upon the giving of at least three months prior written notice
 of such termination. Owner may also terminate this agreement
 upon giving 30 days prior written notice in the event either
 Bruce Strumpf or Robert Thompson cease to be associated with
 Agent.
10. Agent shall furnish Owner with evidence that Agent has in
 force during the term of this agreement such insurance and
 bonds as will in Owner's opinion reasonably protect Owner
 against loss by reason of any negligence, misfeasance, or
 malfeasance by Agent or Agent's officers or employees.
11. This Agreement shall be automatically renewed for the period
 of ninety (90) days and for succeeding 90-day terms upon
 expiration of any renewal hereof for a period of ten years,
 unless either party hereto, sixty days before the termination
 hereof or any renewal hereof, shall, in writing, notify the
 other of its desire not to renew.
12. Agent has authority to execute on behalf of Owner all leases
 having an aggregate total value of $20,000.00 or less and
 having a term not in excess of five years.